UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **DIAMOND VENTURES, LLC,** | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 03-1449 (GK) |
| | : | |
| **SANDY K. BARUAH, ACTING** | : | |
| **ADMINISTRATOR, SMALL** | : | |
| **BUSINESS ADMINISTRATION,** | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION AND ORDER

In this case brought under the Equal Credit Opportunity Act ("ECOA"), Plaintiff, Diamond Ventures, LLC ("Diamond"), claims that the Small Business Administration ("SBA") discriminated against it as a minority-owned company when it failed to license it as a Small Business Investment Company ("SBIC"). Defendant moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, which Plaintiff has opposed. Upon consideration of the parties' submissions and the entire record, and for the following reasons, the Court will **deny** Defendant's motion.

## I. BACKGROUND

SBICs are privately owned companies the SBA licenses to provide financing and consulting services to small businesses. See 15 U.S.C. § 681 et seq. In December 2001, Diamond submitted to the SBA a Management Assessment Questionnaire ("MAQ") dated December 7, 2001, to obtain a Participating Securities SBIC license. Def's Mot., Declaration of Harry Haskins ("Haskins Decl.") [Dkt. No. 90-2] ¶ 20. The MAQ was referred to SBA Financial Analyst Karen Ellis for review. Id. Subsequently, Diamond submitted a revised or amended MAQ dated March 29, 2002. Id. ¶¶ 20-21.

Diamond proposed "to focus on funding businesses in inner city low income areas with high African American populations." 2nd Am. Compl. [Dkt. No. 47] ¶ 57. By letter of April 24, 2002, Diamond submitted another amended MAQ and requested the SBA to review Diamond as a Debenture Securities Licensee, rather than as a Participating Securities Licensee. Haskins Decl., Ex. 4 (sealed).

Ellis recommended against inviting Plaintiff for an interview, and on June 4, 2002, Defendant's Investment Committee unanimously adopted her recommendation, effectively rejecting Diamond's proposal for an SBIC license. Haskins Ex. 6; see 2nd Am. Compl. ¶ 14 ("The SBA does not accept SBIC license applications from those who have not been invited."). Defendant explained its decision in a detailed letter to Plaintiff dated July 23, 2002. Haskins Decl., Ex. 7. Following a meeting with Plaintiff in September 2002, Defendant agreed to review another MAQ submitted by Diamond, in October, 2002, Haskins Decl. ¶ 32, and assigned it to SBA Analyst Stephen Knott for review, Haskins Decl. ¶ 33. Knott also recommended against inviting Plaintiff for an interview, and the Investment Committee again unanimously adopted the recommendation. Id. ¶ 34. Defendant explained its decision in a detailed letter dated February 25, 2003. Haskins Decl., Ex. 11.[1]

Earl Peek, who was a member of Diamond's management team, filed this civil action pro se on June 30, 2003. His second amended complaint filed on December 12, 2003, substituted Diamond Ventures, LLC, as the proper plaintiff. The parties commenced discovery in June 2004 following the Court's denial of Defendant's Rule 12(b)(6) motion to dismiss on the ground that Defendant is

---

[1] In its first MAQ, Plaintiff applied for a Participating Securities License which allows SBICs "to invest SBA guaranteed funds and issue instruments based on an equity interest in its clients or 'portfolio' companies." 2nd Am. Comp. ¶¶ 12-13. In its third MAQ submitted on April 24, 2002, Plaintiff applied for a Debenture Securities License which allows SBICs to loan money to companies at "a stated rate of interest." Id. This was later clarified to mean a Debenture, not a Participating Securities, application. Plaintiff challenges Defendant's rejection of its application for a Debenture License. 2nd Am. Compl. ¶ 25.

not a creditor within the meaning of ECOA.  See Memorandum Opinion and Order of June 8, 2004 [Dkt. No. 25].  Defendant has not renewed the foregoing argument as a basis for dismissal or summary judgment.

Defendant filed its Motion for Summary Judgment on October 30, 2008 and briefing was completed on March 26, 2009.

## II.	STANDARD OF REVIEW

Summary judgment is warranted only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  As a general rule, "[i]n deciding whether there is a genuine issue of fact before it, the court must assume the truth of all statements proffered by the party opposing summary judgment."  Greene v. Dalton, 164 F.3d 671, 674 (D.C. Cir. 1999).  All reasonable inferences that may be drawn from the facts must be drawn in favor of the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  The non-movant, however, "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Id., 477 U.S. at 248.

"A dispute over a material fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the non-moving party'. . . . Factual disputes that are irrelevant or unnecessary will not be counted." Arrington v. United States, 473 F.3d 329, 333 (D.C. Cir. 2006) (quoting Anderson, 477 U.S. at 248).  A fact is "material" if it might affect the outcome of the case under the substantive governing law. Anderson, 477 U.S. at 248.  When facts are not controverted in opposition to a summary judgment motion, the Court "may assume that facts identified by the

moving party in its statement of material facts are admitted." Local Civil Rule 7(h). When facts are disputed, however, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts, are jury functions, not those of a judge." Anderson, 477 U.S. at 255. The Supreme Court has consistently emphasized that "at the summary judgment stage, the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." Id. at 248. Our Court of Appeals has warned that in cases alleging discrimination, summary judgment "must be approached with special caution." Aka v. Washington Hospital Center, 116 F.3d 876, 879-80 (D.C. Cir. 1997), rev'd on other grounds, 156 F.3d 1284 (D.C. Cir. 1998) (en banc) (citation and internal quotation omitted).

## III. ANALYSIS

ECOA makes it unlawful for any creditor to discriminate against any application, with respect to any aspect of a credit transaction . . . on the basis of race. . . ." 15 U.S.C. § 1691(a). The purpose of ECOA is to prohibit "credit decisions based on factors such as . . . race which are irrelevant to creditworthiness." Miller v. Am. Express Co., 688 F.2d 1235, 1238 (9th Cir. 1982).

Pursuant to the Small Business Investment Act, the SBA licenses SBICs to "stimulate and supplement the flow of private equity capital and long-term loan funds" to small businesses. 15 U.S.C. § 661. In general, SBICs raise their own financing capital by, among other vehicles, issuing securities backed or guaranteed by the SBA. Thus, in the event an SBIC defaults on its commitment to security holders, the SBA guarantees payment and the SBIC becomes indebted to the SBA for repayment. Haskins Decl. ¶¶ 5-8. Upon receipt of an application for an SBIC license, the SBA Administrator must determine whether the applicant meets certain private capital requirements and whether its management "is qualified and has the knowledge, experience, and capability necessary

to comply with this chapter." 15 U.S.C. § 681(c)(3). Consideration is given to "the need for and availability of financing for small business concerns in the geographic area in which the applicant is to commence business," the business reputation of the applicant's owners and management and the probable success of proposed operations, "including adequate profitability and financial soundness." Id.

The "first step" in the process is "the [applicant's] submission of an MAQ, which seeks information primarily on the proposed business strategy of the SBIC and the qualifications of the individuals who will manage the prospective SBIC." Haskins Decl. ¶ 12. If a majority of Defendant's Investment Committee votes in favor of the MAQ, the "prospective management team is invited for an interview. If that is successful, [the team] receives what is commonly referred to as a 'go-forth' letter formally inviting them to submit a formal SBIC License Application." Id. ¶ 15.

### A. Disparate Impact Discrimination

The Supreme Court has ruled that "Title VII . . . prohibits . . . both intentional discrimination . . . as well as, in some case, practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities (known as 'disparate impact')." Ricci v. DeStafano, __ U.S. __, 129 S. Ct. 2658, 2672 (2009) (parenthesis in original).[2]

To demonstrate disparate impact, Plaintiff "must offer statistical evidence of a kind and degree sufficient to show that the seemingly neutral practice in question has caused the exclusion of applicants for [credit] because of their membership in a protected group." Watson v. Fort Worth

---

[2] Because the District of Columbia Circuit has "express[ed] no opinion about whether a disparate impact claim can be pursued under ECOA," this Court will follow the D.C. Circuit's lead and "[a]ssum[e] without deciding that a disparate impact claim is cognizable under ECOA." Garcia v. Johanns, 444 F.3d 625, 633 n. 9 (D.C. Cir. 2006).

Bank and Trust, 487 U.S. 977, 994 (1988). Moreover, "a showing of a [specific or particular practice] is an integral part of the plaintiff's . . . case in a disparate-impact suit." Wards Cove Packing Company, Inc. v. Antonio, 490 U.S. 642, 657 (1989). Finally, as recently as last year, the Supreme Court re-affirmed that a defendant may be liable for disparate impact discrimination provided the plaintiff can prove that the challenged practice is not job related, is not consistent with business necessity, or that there existed an equally valid, less-discriminatory alternative that served defendant's needs but that it refused to adopt. Ricci, 129 S. Ct. at 2678.

Plaintiff can avoid summary judgment by presenting "data showing that the [SBA approved debenture licenses to African American owned businesses] at rates far below their numbers in the applicant pool and the general population." Holcomb v. Powell, 433 F.3d 889, 899 (D.C. Cir. 2006) (citations omitted). "Under Title VII disparate impact analysis, an employment test with an adverse impact on racial minorities is prohibited unless the test is 'demonstrably a measure of job performance.'" Rudder v. District of Columbia, 890 F. Supp. 23, 40 (D.D.C. 1995) (quoting Griggs v. Duke Power Co., 401 U.S. 424, 436 (1971)). On summary judgment, however, the question is not whether the practice is legitimate but rather "whether the plaintiff[] [has] cast such doubt on [defendant's] credibility that a reasonable juror could regard it as pretext and infer a discriminatory motive, or that a reasonable factfinder could conclude it was inconsistent with business necessity or achievable in a nondiscriminatory way." Anderson v. Zubieta, 180 F.3d 329, 345 (D.C. Cir. 1999).

**B.     Plaintiff's Allegations of Specific Practices Causing Disparate Impact**

Plaintiff alleges that the SBA discriminated against it by denying its application for an SBIC Debenture License. The SBA denies such discrimination and responds, basically, that the License was denied because Plaintiff could not meet the agency's qualifications. In particular, the SBA

claims that the Plaintiff lacked sufficient experience in the area of venture capital investments and exits from such investments, that there was inconsistency between Plaintiff's Business Plan and Investment Strategy, that Plaintiff's management team had not demonstrated a history of working together as a cohesive team on any venture related projects, and that only two of the four team members had worked together at all previously.

It is clear that the SBA has proffered legitimate, non-discriminatory reasons for its denial of Plaintiff's SBIC license application. Therefore, the question becomes whether Plaintiff has produced sufficient evidence for a reasonable fact-finder to conclude that the SBA's reasons were not the actual reasons, but only a pretext to mask intentional discrimination against Plaintiff on the basis of race. See Brady v. Office of the Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008).

Plaintiff proffers much evidence in opposition to Defendant's justification for denying its application, only some of which the Court need address at this time.

First, it offers the testimony of two qualified experts who have both rendered opinions that Plaintiff was in fact qualified to be licensed as an SBIC.[3] Expert Report of Dr. Timothy Bates ("Bates Report"), at 66, Ex. G to Declaration of Jaime W. Luse ("Luse Decl.") (Diamond "ranks as a particularly highly qualified SBIC applicant"); Expert Report of Edward Cleveland ("Cleveland Report"), Ex. H to Luse Decl. at 9 ("this team will be very successful and a model for the program in coming years").

Second, Plaintiff presents a comparison of the areas in Diamond's final MAQ which were criticized by Knott, with other applications that received go-forth letters or licenses and contained

---

[3] The question of the respective qualifications of Diamond's experts is one of the many disputed material acts which must be resolved by the jury.

material in their MAQs similar to that which Diamond presented, and were not criticized. In particular, Plaintiff asserts that this comparison shows that the SBA praised non-minority led firms planning to invest in LMI[4] areas that are not known to have high-minority populations and that Plaintiff was criticized for proposing to invest in LMI areas with high African American populations such as those in portions of the Southeast United States. Again, the accuracy of the facts relied upon--and/or ignored--in these comparisons, as well as the final conclusions to be drawn from the comparisons, are issues which only a jury can resolve.

Third, Plaintiff offers evidence that while venture capital and equity experience may be useful proxies (or substitutes) for race, there is no study validating them as a reliable predictor of success for SBICs.

Fourth, the main thrust of Plaintiff's argument is that the SBA's "five year rule"[5] (which the Court will assume is, in fact, either an absolute or de facto requirement)[6] results in a disparate impact on African American owned or managed firms, and that Defendant cannot prove that such requirement is job-related, or consistent with business necessity, or that there are no valid, less discriminatory alternatives. See Ricci, 129 S. Ct. at 2678.

When evaluating whether Plaintiff has sufficient evidence to survive summary judgment, it is necessary to view the SBA's insistence on meeting this "five year requirement" against what Plaintiff's expert has described as a "long, detailed history" of interacting with both African

---

[4] None of the papers submitted by the parties define the acronym "LMI."

[5] The SBA requires that each SBI applicant have at least two principals each of whom has five years or more of experience in venture capital investing.

[6] This assumption comports with the requirement that all inferences be drawn in favor of the non-moving party. See Anderson, 477 U.S. at 248.

American funds and minority-oriented venture capital funds in an atmosphere of "antagonism and distrust." Bates Report, at 54 (citing Final Report. An Analysis of the SSBIC Program: Problems and Prospects (Bates, 1995)).[7] See also, United States Commission on Civil Rights Evaluation Publication, Ten Year Check-Up: Have Federal Agencies Responded to Civil Rights (June 12, 2003).

In particular, Dr. Bates reports that the SBA is aware that only two African American controlled SBICs, both owned by one firm, have ever been licensed, out of a total of approximately 350 in existence in 2003. Bates Report, at 47. Furthermore, the SBA's own statistics show that in Fiscal Year 2002, "50% or more Black-Owned" firms received only 2.55% of total Regular SBIC financings, and 0.49 percent of funding from Regular SBIC funding dollars; and in Fiscal Year 2003, "50% or more Black-Owned firms received only 5.37% of total Regular SBIC financings and 1.64[%] of Regular SBIC funding dollars." Ex. R and S to Luse Decl. If these figures are correct, no more than 0.86% of SBICs in 2003 were African American owned and controlled.

Fifth, Plaintiff offers Dr. Bates' report as "reliable statistical disparate impact evidence" "to show that the seemingly neutral practice in question has caused the exclusion of applicants" because of their race. Watson, 487 U.S. at 994. In this case, the expert's task is made that much more difficult because of the failure of SBA to record the race of SBIC applicants who fail to obtain licenses. Because of that failure, it is virtually impossible to determine the number of minority and

---

[7] It should be noted that the SBA itself commissioned this Report from Dr. Bates who is the Distinguished Professor of Economics at Wayne State University. Both the SBA and the Department of Justice have retained Dr. Bates, at different times, to consult about the existence of racial discrimination in the marketplace.

non-minority applicants who applied to the program and were rejected.[8]  However, the Supreme Court has spoken directly to this difficulty, stating that "in cases where [such] statistics will be difficult if not impossible to ascertain, . . . certain other statistics--such as measures indicating the racial composition of 'otherwise-qualified applicants' for at-issue jobs--are equally probative. . . ." Wards Cove, 490 U.S. at 651; see Malave v. Potter, 320 F.3d 321, 326 (2d Cir. 2003) (finding "error for the District Court to have rejected out of hand [plaintiff's] statistical analysis" where data on the number of qualified Hispanic applicants was not available to conform to "the *preferred* methodology described in Ward's Cove" (emphasis in original)).

Based on data gathered from surveying 24 minority venture capitalists who are members of the National Association of Investment Companies ("NAIC"), Bates Report at 12, Dr. Bates wrote that the SBA "require[s] principal work experience in investment banking and mainstream venture capital investing fields in which very few minorities were traditionally able to obtain such experience," id. at 72, "while downgrading the actual work experience" in "commercial banking and local economic development" that most "often typifies principals of minority-oriented [venture capital] funds." Id.[9]  Dr. Bates concludes that the "result is a population of SBICs where only a fraction of 1% of the funds are owned and controlled by African Americans."  Id.   Dr. Bates

---

[8]  While it is true that the SBA does keep statistics on the race of successful applicants, it is hard to believe that in this day and age any federal agency fails to keep statistics on those who apply and are not successful.

[9]  There is no question that the SBA raises many challenges to the methodology used by Dr. Bates in his "comparability analysis."  Both sides spend many pages in their briefs arguing about the analysis and the validity of the comparisons.  Again, however, the evaluation of expert testimony is clearly within the province of the jury.  No issue could be more "material" to the final verdict it will render in this case than the weight it does, or does not, accord to Plaintiff's statistical evidence--especially in light of the absence of relevant racial statistics from the SBA.

"believe[s] that nearly all of the profit-oriented [venture capital] funds serving black and Hispanic (but not Asian) firms are NAIC members." Bates Report at 12 (parenthesis in original). It appears that he identified 24 such firms as qualified SBIC applicants, see id. at 12-13 (excluding 12 "funds" that "were largely newer funds that had not completed or recently completed fundraising and had not yet made VC investments"). Dr. Bates reports that "[t]he 23 [sic] minority-oriented funds extensively discussed [] are run by principals of diverse racial backgrounds, but most are African Americans: 28 of the 39 principals were African Americans, three were Hispanic, three were Asian and five were white." Id. at 45.

Although Defendant has concluded that venture capital experience is part and parcel of running a successful SBIC, see Haskins Decl. ¶¶ 5, 13-15; Def.'s Ex. 4, Declaration of Darryl Hairston ("Hairston Decl.") ¶ 9, it has not proffered any empirical evidence linking the equivalent of ten years' venture capital experience (at least two principals each with five years' experience) to the success of an SBIC.

There is no question that "[u]nder Title VII disparate impact analysis, an employment test with an adverse impact on racial minorities is prohibited unless the test is 'demonstrably a measure of job performance.'" Rudder v. District of Columbia, 890 F. Supp. 23, 40 (D.D.C. 1995) (quoting Griggs v. Duke Power Co., 401 U.S. 424, 436 (1971)). The SBA has offered no such evidence. Indeed the SBA has acknowledged that "successful [SBIC] managers usually have many years of experience in venture capital or related fields." Hairston Decl. ¶ 9 (emphasis added). In addition, Hairston, SBA Deputy Associate Administrator for Management and Administration, who "was also involved in creating and implementing the initial versions of the [MAQ] process," Hairston Decl.

¶ 3, acknowledges the "relevan[cy]" to debenture SBICs of commercial lending and economic development experience. Id. ¶¶ 10-11.

Plaintiff has suggested that Defendant modify its evaluative criteria for SBICs to place work experience in the commercial banking and local development fields (where African Americans have had relevant experience) on equal footing with the venture capital experience that principals of African American firms have traditionally lacked. See Bates Report at 46 (prior to 1999, principals of only one minority-owned venture capital fund had prior work experience in investment banking prior to joining the minority fund). Summary judgment "is not appropriate" if, as here, Plaintiff shows "that there is an alternative that can satisfy the employer's need in a nondiscriminatory fashion." Anderson, 180 F.3d at 344. There is no evidence that Defendant has ever considered this, or any other alternative, to substitute for or alleviate the disparate impact of the "five year rule."

Sixth, Plaintiff offers the Report of the SBA Inspector General, issued March 20, 2003, concluding that "[t]he Division's evaluation of the application [of Diamond] and the decision to deny were not accomplished in accordance with the existing SBA procedures and criteria." OIG Report, Ex. CC to Luse Decl. at 2.[10]

Seventh, Plaintiff also offers the following evidence of what it calls "direct evidence of direct discriminatory conduct." While that evidence, by itself, would not suffice to convince a reasonable

---

[10] Presumably, the jury will also be informed that the Inspector General concluded that no decision made by SBA regarding Plaintiff was based on the race of Plaintiff's principals.

jury of direct discrimination,[11] it may still be presented to the jury for its consideration on the issue of disparate impact.

In view of Plaintiff's evidence that the challenged "five year rule" disproportionately excludes African American firms from securing SBIC licenses, the absence of any statistical or other kinds of evidence showing a "demonstrable relationship" between the challenged criteria and an SBIC's success, Plaintiff's suggested nondiscriminatory alternative solution, the SBA's history vis-a-vis involvement of African American owned funds into its programs, and the numerous material facts in dispute,[12] the Court finds that genuine issues of material fact exist with regard to Plaintiff's disparate impact claim and that Plaintiff has offered sufficient evidence from which a reasonable jury could conclude that Defendant is liable for disparate impact discrimination on the basis of race. Accordingly, it is

**ORDERED** that Defendant's Motion for Summary Judgment [Dkt. No. 90] is **denied**; and it is

---

[11] See, for example, the early comments of Leonard Fagan, whose job was simply to intake MAQs filed by email to the Investment Division, but e-mailed that the MAQ was "weak," and noted that Peak was a "frat brother" of another SBA employee who was African American, and the comments of Karen Ellis, who reviewed Plaintiff's first MAQ, that Peek "had a sense of entitlement about being in the program," and "knew that all along I didn't think he was going to get an interview [to receive a go-forth letter] . . . I had told them [Diamond] that probably since the day [I] started reviewing the MAQ," and her denials of knowing the race of the applicants when the MAQ she was reviewing contained that information.

[12] See Diamond Ventures's Statement of Genuine Issues and Statement of Facts [Dkt. No. 102].

**FURTHER ORDERED** that the parties shall appear for a Status Conference on **April 15, 2010, at 10:45 a.m.**

March 29, 2010

/s/
GLADYS KESSLER
United States District Judge

**Copies via ECF to all counsel of record**